Rosa FIGUEROA GARCIA, Plaintiff,

v.

LILLY DEL CARIBE, INC.,
et al., Defendants.

Civil No. 04–2354 (GAG).

United States District Court,
D. Puerto Rico.

March 20, 2007.

Maria J. Marchand–Sanchez, Yahira Caro–Dominguez, Ferraiuoli–Torres, Marchand & Rovira PSC, San Juan, PR, for Plaintiff.

Mariela Rexach–Rexach, Carl E. Schuster, Maria L. Santiago–Ramos, Schuster & Aguilo LLP, San Juan, PR, for Defendants.

## OPINION & ORDER

GELPI, District Judge.

The plaintiff, Rosa Figueroa Garcia ("Figueroa"), commenced this action against her former employer, Lilly del Caribe, Inc. ("Lilly" or "the company"), alleging sexual harassment and retaliation in violation of Title VII, 42 U.S.C. § 2000e–2000e–17, and asserting several Puerto Rico law claims. Presently before the Court is Lilly's motion for summary judgment (Docket No. 12), Figueroa's opposition thereto (Docket No. 19), and Lilly's subsequent reply (Docket No. 23). After reviewing the relevant facts and applicable law, the court **DENIES IN PART** and **GRANTS IN PART** Lilly's motion for summary judgment (Docket No. 12).

## I. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "An issue is genuine if it may reasonably be resolved in favor of either party at trial, and material if it posses[es] the capacity to sway the outcome of the litigation under the applicable law." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir.2006) (alteration in original) (citations and internal quotation marks omitted).

The moving party bears the initial burden to demonstrate the lack of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. In order to defeat summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences. *Id.* at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. *Id.*

In disputes involving questions of motive or intent, the movant's burden is particularly rigorous. Unsettled issues regarding motive and intent will often preclude sum-

mary judgment. *See Lipsett v. Univ. of P.R.*, 864 F.2d 881, 895 (1st Cir.1988). Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." *Forestier Fradera v. Municipality of Mayaguez*, 440 F.3d 17, 21 (1st Cir.2006) (quoting *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003)). The court should deny summary judgment when the non-moving party "can point to specific facts detailed in affidavits and depositions—that is, names, dates, incidents, and supporting testimony—giving rise to an inference of discriminatory animus." *Lipsett*, 864 F.2d at 895.

## II. Factual Background

The court derives the following factual summary from the parties' statements of material facts (Docket Nos. 12–2, 19–2, 23–2) except where otherwise noted.[1] Consistent with the summary judgment standard, the court states the facts in the light most favorable to Figueroa. *See Iverson*, 452 F.3d at 98. Additionally, in accordance with Local Rule 56, the court credits only facts properly supported by accurate record citations. *See* Local Rule 56(e). The court has disregarded all argument, conclusory allegations, speculation, and improbable inferences disguised as facts. *See Forestier Fradera*, 440 F.3d at 21; *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

On January 19, 1981, Figueroa began working as a Production Operator for Lilly, a pharmaceutical company, at its production and packaging site in Carolina, Puerto Rico. During the final five years of her employment with Lilly, Figueroa occupied the Warehouse Operator position.

Odín Correa, Carlos González, Carlos Vellón ("Vellón"), Herminio Rodríguez ("Rodríguez"), Aida Ramos, and Rosa Ramos also occupied the Warehouse Operator position during Figueroa's tenure. Edna Ort, the Warehouse Supervisor, supervised Figueroa from at least August 2000 until her termination on August 13, 2003. Luis Ortiz held the position of Warehouse Group Leader. *See* Docket No. 12–2, ¶¶ 1–5.

During her employment at Lilly, Figueroa received a copy of Lilly's Employee Manual which included the company's sexual harassment policy. She also received an update of the sexual harassment policy on January 31, 2002. *See id.* at ¶¶ 10–12. Figueroa participated in numerous training sessions while at Lilly, but she never received training specifically pertaining to the company's sexual harassment policy despite repeated requests for such training. *See* Docket No. 19–2, ¶ 2. Lilly's amended sexual harassment policy provides an explanation of the prohibited conduct, which includes "any unwelcome sexual suggestion, request for sexual favors, sexual demands, or any other verbal, physical, or visual conduct of a sexual nature." Docket No. 12–2, Exh. 5. The policy requires a sexual harassment complaint to be addressed to the complaining individual's supervisor (unless the alleged harasser is the supervisor) and Human Resources personnel. The policy also assures that employees who complain of sexual harassment or participate in an investigation will be protected against retaliation, that a prompt and impartial investigation of any complaint will take place, and that the company will take appropriate corrective action when it determines that harassment has occurred. *See* Docket No. 12–2, ¶ 13.

---

1. Figueroa's statement of facts, at times, mischaracterizes her own deposition testimony. Where Figueroa's statement of facts does not accurately recap her testimony, the court cites directly to her deposition transcript. Portions of Figueroa's deposition are included in the record at Docket Nos. 12, 19, and 23.

In her Complaint, Figueroa alleges that she suffered sexual harassment by co-workers Rodríguez and Vellón over a period of three years. Figueroa first met Rodríguez when she began working as a Warehouse Operator and continued to work with him up until her termination in August 2003. She worked with Vellón for approximately one year, from August 2002 until August 2003. *See id.* at ¶¶ 7, 16. During her deposition, Figueroa identified the specific incidents that serve as the basis for her hostile work environment claim.

Sometime in 2000, Rodríguez began to make sexually suggestive comments to Figueroa. On or around August 2000, Rodríguez told Figueroa in front of a supplier that she was good enough to eat. *See* Figueroa Depo. pp. 118, 120–21. A few months later, Rodríguez asked Figueroa if she was a member of the New Progressive Party ("NPP"). When Figueroa inquired why he wanted to know, Rodríguez responded by analogizing Figueroa's female genitalia to the NPP's palm branch insignia. *See id.* at pp. 118–19, 125. On another occasion, Rodríguez told Figueroa that the brassiere she was wearing looked good on her and commented that it was not the same one she wore the previous week. Figueroa responded by telling him to go to hell. *See id.* at pp. 119, 129–31. Rodríguez frequently told Figueroa how good she looked in jeans, especially while doing exercises. *See id.* at p. 119. He also commented on her underwear and the size of her waist. *See id.* at pp. 130–31. On many occasions, he would lick and smack his lips at Figueroa. *See id.* at p. 119. One day, he commented that Figueroa was enough of a woman to satisfy him and the entire warehouse. He also insisted on kissing Figueroa every morning although she requested that he not do so. *See*

Docket No. 19–2, ¶ 26; Docket No. 12–2, Exh. 14, p. 3. Approximately two or three months before her termination in 2003, Rodríguez invited Figueroa to a hotel. *See* Figueroa Depo. p. 121, 132, 135. Figueroa responded to the invitation by urging Rodríguez to call her boyfriend to ask his permission. *See id.* at pp. 132–33. Figueroa frequently responded to Rodríguez's comments by joking with him or telling him to go to hell; at other times, she would get upset or talk dirty to him. *See id.* at pp. 129, 132. Rodríguez sometimes made sexually suggestive comments to Figueroa in front of Edna Ortiz and other employees. *See id.* at pp. 59, 119, 131–32.

The alleged harassment by Vellón began the day Figueroa met him. On the first day the two met, sometime in August 2002, Vellón told Figueroa that he would marry an older woman like her, one who looked like a 20–year–old. Figueroa laughed at his comment. She also stated that she could be his mother. Vellón responded by using the term "mamá" in a sexually suggestive manner.[2] Docket No. 19–2, ¶ 21; Figueroa Depo. pp. 58, 62–64, 68. A few months later, Vellón told Figueroa that her G-string lingerie looked good on her. *See* Figueroa Depo. pp. 59, 72. Approximately one or two months later, another incident occurred during an exercise session. During the exercise session, Vellón said to Figueroa, "imagine me waiting for you with my penis erected while you do squats." In response, Figueroa told him, in reference to his genitalia, "I would not bother looking at that peanut." *See id.* at pp. 59, 72–73.

Vellón and Rodríguez frequently said things of a sexual nature to Figueroa during exercise sessions. *See id.* at pp. 59, 70. On one occasion, they commented on the

---

**2.** The Spanish word "mamá" translates to "mommy" or "mother" in the English language. The Spanish verb "mamar" translates to "to suck."

fit of Figueroa's jeans, how well she bent, and how well she looked. *See id.* at p. 59. The two men would also joke with one another about the sexual comments they made to Figueroa during exercise sessions. *See id.* at p. 119. Figueroa testified that, generally, Rodríguez and Vellón directed sexual comments and innuendo towards her two or three times per week. *See id.* at p. 189.

On August 1, 2003, an incident occurred in the warehouse, the details of which the parties contest. The parties also contest when and by whom the incident was reported to Human Resources. Additionally, the party's dispute some details of Lilly's investigation of the incident.

According to Lilly, Vellón complained on or around August 8, 2003 to Edna Ortiz and Efraím Ortiz regarding the August 2003 incident. Vellón alleged that Figueroa had purposely grazed his crotch with her hand while making comments regarding the size of his penis and exclaiming "see, he is not wearing a cup, it is real." Rosa Jiménez, an Engineer, and Rosa Ramos were present during the event. Figueroa later made a similar comment to Vellón in front of Miriam González. *See* Docket No. 12–2, ¶¶ 23, 24.

Figueroa's version of the events differs drastically from Lilly's version. She states that Vellón inappropriately touched her when he rubbed his erect penis against her buttock. Figueroa was seated in a chair and tying her shoes when Rosa Ramos signaled to her to turn around and told her to look at Vellón who was standing behind her with an erected penis. When Figueroa stood up, Vellón rubbed his penis against her right buttock. Figueroa then pushed him away. Vellón responded by telling Figueroa that she had a desirable body.[3] Later, he apologized to Figueroa.

*See* Docket No. 19–2, ¶ 8. Following the incident, Figueroa did not speak with Miriam González. *See id.* at ¶ 14. She did, however, immediately complain to Luis Ortiz about the incident. *See id.* at ¶¶ 10, 15.

Figueroa verbally complained to Lilly officials about Rodríguez and Vellón's conduct on more than one occasion before August 2003. At one time or another, she addressed her complaints about the perceived sexual harassment to the following individuals: Edna Ortiz, her supervisor; Luis Ortiz, Warehouse Group Leader; Efraím Ortiz, Human Resource Manager; Nilda Nieves ("Nieves"), Human Resources Representative; and Tere Colón ("Colón"), Department Head. *See* Docket No. 19–2, ¶ 2.

Figueroa first complained to Edna Ortiz in August 2000 when Rodríguez told Figueroa in front of a supplier that she was good enough to eat. Upset by the incident, Figueroa went to cry in the bathroom. While in the bathroom, Figueroa encountered Edna Ortiz, her supervisor. Figueroa told her about the incident and that she felt sexually harassed by Rodríguez. *See* Figueroa Depo. pp. 118–22. In response, Edna Ortiz said she would talk to Rodríguez. *See id.* at pp. 118. She also stated that Rodríguez is a man of the church, that Figueroa was going to hurt him, that Figueroa should talk to Rodríguez herself, and that Figueroa should make herself be respected. *See id.* at pp. 121–22. On March 23, 2001, Figueroa told Edna Ortiz that she felt harassed by Rodríguez because "he made movements with his tongue and noises with his mouth, referring to [her]." Edna Ortiz told Figueroa to "stop [her] childishness and to make [herself] be respected." *See* Docket No. 12–2, Exh. 14, p. 5. In August 2002, she again complained about sexual harassment

---

3. Specifically, Vellón stated, "Rosa, estás cabrona." In Puerto Rican slang, this phrase roughly translates to "Rosa, you have a hot body."

by Rodríguez, this time to Nieves. Edna Ortiz was also present during the meeting. Figueroa expressed her dissatisfaction with the company's response to her complaints about Rodríguez' comments. She told Nieves and Edna Ortiz that she was fed up with being ignored. Edna Ortiz suggested that Figueroa did not know how to explain things and criticized her tone. Figueroa received a verbal reprimand for her tone, which Nieves viewed as disrespectful. *See* Figueroa Depo. pp. 157–59. At some later point in time, Figueroa informed Edna Ortiz and Efraím Ortiz that she felt harassed by Rodríguez and Vellón. She also told both Edna Ortiz and Efraím Ortiz that she was concerned with their unresponsiveness to prior complaints. *See id* . at pp. 99, 105. At some point in 2003, Figueroa informed Colón that she felt harassed by Rodríguez and Vellón and expressed concern that she had complained to Edna Ortiz and Efraím Ortiz on prior occasions yet Lilly did nothing to alleviate the situation. Colón said she would investigate and call Figueroa later. Figueroa never heard anything more from Colón. *See id.* at pp. 184–86.

Figueroa informed Luis Ortiz, Efraím Ortiz, Edna Ortiz, and Nieves of the August 2003 incident with Vellón. On the day of the incident, she complained to Luis Ortiz, Warehouse Group Leader. He said that he would discuss the matter with Edna Ortiz when she returned from vacation. *See id.* at pp. 85–86. A few days after the incident, Figueroa informed Efraím Ortiz of what had occurred. She also reminded him that she felt sexually harassed by Rodríguez and Vellón. In response, he told her that such incidents would not occur if she made her co-workers respect her. *See id.* at pp. 96, 99, 101.

Figueroa again provided her version of the events to Efraím Ortiz in a meeting on August 8, 2003. She prepared a written account of the incident during the meeting.[4] *See id.* at pp. 90–92, 96–98. A few minutes before her meeting with Efraím Ortiz, she narrated the August 2003 incident to Edna Ortiz. Edna Ortiz also told Figueroa to make her co-workers respect her. *See id.* at pp. 94, 104–05. Two days after talking with Edna Ortiz and Efraím Ortiz, Figueroa met with Nieves. Figueroa recounted the August 2003 incident and informed Nieves of all of Rodríguez and Vellón's sexually suggestive conduct. She explained to Nieves that she had informed Edna Ortiz and Efraím Ortiz of their conduct yet nothing was done to stop it. *See id.* at pp. 108–12.

Lilly initiated an internal investigation of the August 2003 incident after Vellón reported it to his supervisor and a Human Resources official via an e-mail sent August 8, 2003. The company interviewed Vellón, Figueroa, Luis Ortiz, Miriam González, Rosa Jiménez, and Rosa Ramos and took notes during each meeting. Lilly also collected written statements from Rosa Ramos, Rosa Jiménez, Luis Ortiz, and Miriam González. Rosa Jiménez and Rosa Ramos witnessed the event; Luis Ortiz and Miriam González provided statements regarding their interactions with Vellón and Figueroa shortly after the incident. Although the information provided by Rosa Ramos, Rosa Jiménez, Luis Ortiz, and Miriam González did not completely mirror Vellón's allegations, Lilly concluded that the version of events told by the interviewed employees substantiated Vellón's version of the incident, not Figueroa's. As a result of its investigation, Lilly concluded that Figueroa engaged in con-

---

4. Figueroa testified that she prepared a written account of the incident and handed it to Efraím Ortiz. She also stated that she did not keep a copy of the statement. *See* Figueroa Depo. pp. 90–92. Lilly contends that Figueroa refused to provide a written statement. *See* Docket No. 19–2, Exh. 3.

duct violative of the company's policies, and violated the terms of her probation. The investigation lead directly to Figueroa's termination on August 13, 2003. The company also reprimanded Rosa Ramos and Rosa Jiménez for their involvement in the August 2003 incident. *See* Docket No. 12–2, ¶¶ 23–38. Figueroa testified that, although the investigatory notes indicate that she met simultaneously with Nieves and Efraím Ortiz to discuss the August 2003 incident, no such meeting took place. *See* Docket No. 19–2, ¶ 16.

At the time of the final incident, Figueroa was on probation. Figueroa's probation followed a series of disciplinary reprimands in 2002. On January 28, 2002, Figueroa received her first disciplinary warning since she began working at Lilly in 1981. Efraím Ortiz gave Figueroa a written reprimand for failure on four occasions to follow company procedures regarding the verification and calibration of scales. Lilly gave the disciplinary warning to most of the warehouse employees. Figueroa and Rosa Ramos responded in writing to the allegations and contested the reprimand. *See* Docket No. 12–2, ¶ 16; Docket No. 19–2, ¶ 4.

Several months later, on August 14, 2002, Figueroa received an oral warning following an incident during a meeting in the Human Resources Department. During the August 14th meeting, Figueroa complained to Nieves, a Human Resources Representative, about Rodríguez' conduct. Figueroa stated to Nieves that she had complained before yet Lilly failed to take any action; she accused the Human Resources Department of ignoring the incidents. Figueroa was later admonished for discourteous behavior during the meeting. She apologized for the incident. *See* Docket No. 12–2, ¶ 18 & Exh. 8; Docket No. 19–2, ¶ 4.

The following month, Figueroa received another disciplinary reprimand. On Sep-

tember 24, 2002, she requested three days of emergency leave without pay. Management approved the request but determined the absences would count against her annual leave percentage. When Kevin Ruiz, the Warehouse Group Leader at the time, attempted to explain the decision, Figueroa demanded that he give her a "yes" or "no" answer regarding the leave and did not permit him to explain. She then abruptly hung up the phone, ending the conversation. Human Resources personnel viewed Figueroa's conduct as offensive and discourteous. *See* Docket No. 12–2, ¶ 18 & Exh. 8.

On September 26, 2002, Lilly placed Figueroa on probation for one year. The probationary memo specifically referenced the January 2002 written reprimand, the August 2002 incident, and the September 24th incident as reasons for the probationary period. The memo stated that failure to implement corrective actions or engagement in additional violations of company policy could result in her termination. *See id.* at Exh. 8.

On January 14, 2003, Edna Ortiz completed an evaluation of Figueroa's performance. The performance appraisal referenced the August 2002 incident with Nieves and the probation letter. The evaluation noted that Figueroa does not express disagreements constructively. It also stated that she only partially complied with the company's expectation that she show respect to others with different skills, ideas, background, and levels. The evaluation advised Figueroa that she should communicate and treat co-workers and clients with more respect. Despite the apparent shortcomings in Figueroa's performance, she received a performance score of 2.5 out of a maximum 3. At the time Edna Ortiz completed the evaluation, more than eight months remained in Fi-

gueroa's probationary period. *See* Docket No. 19–2, Exh. 1.

The final step in Lilly's disciplinary process occurred approximately seven months after the evaluation. On August 13, 2003 when the company terminated Figueroa's employment. Pending the results of the investigation of the August 2003 incident, Lilly placed Figueroa on suspension. Following the investigation, the company concluded that Figueroa violated the terms of her probationary period and violated the company's rules and policies. Lilly, therefore, terminated Figueroa's employment. *See* Docket No. 12–2, ¶¶ 35–37, 41.

### III. Discussion

#### A. Hostile Work Environment

■ In her complaint, Figueroa alleges that she suffered sexual harassment in the form of a hostile work environment created by Rodríguez and Vellón's conduct. To succeed in a hostile work environment claim, the plaintiff must show the following: (1) she is a member or a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the sexually objectionable conduct was both objectively and subjectively offensive such that a reasonable person would find it hostile or abusive and the victim did in fact perceive it to be so; and (6) some factual basis for employer liability exists. *See Valentin–Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir.2006) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir.2001)).

Lilly attacks Figueroa's claim with three separate arguments. First, Lilly contends that the incidents between Figueroa and Rodríguez or Vellón were not sufficiently severe or pervasive to support a hostile work environment claim. Second, Lilly argues Figueroa did not subjectively perceive Rodríguez and Vellón's conduct to be offensive. Finally, Lilly avers that Figueroa cannot establish a basis for employer liability.

#### 1. Severe or Pervasive

■ The severe or pervasive inquiry is highly fact specific. *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 19 (1st Cir.2002). To assess whether conduct is sufficiently severe or pervasive to create a hostile environment, the court must consider the totality of the circumstances. There is no mathematically precise test used to determine whether a plaintiff has demonstrated sufficiently severe or pervasive harassment. *See Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 83 (1st Cir.2006) (citing *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir.2003)). Factors the court should consider include "the frequency of the discriminatory conduct; its severity; whether it is threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). " 'Subject to some policing at the outer bounds,' it is for the jury to weigh [the] factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that if affected the conditions of her employment." *Id.* (quoting *Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 474 (1st Cir.2002)).

■■ In characterizing the hostile or abusive workplace, courts have drawn a continuum between commonplace indignities and actionable harassment. Offhand remarks, simple teasing, tepid jokes, and isolated incidents are at one end of the continuum. This type of behavior, standing alone, usually does not amount to a hostile work environment. Severe or per-

vasive sexual remarks, innuendoes, ridicule, and intimidation fall at the other end of the continuum and may support a jury verdict finding a hostile work environment. *Noviello v. City of Boston,* 398 F.3d 76, 92 (1st Cir.2005); *Marrero,* 304 F.3d at 19; *Figueroa Reyes v. Hosp. San Pablo del Este,* 389 F.Supp.2d 205, 213 (D.P.R.2005). Determining where along the continuum specific conduct lies is a difficult task typically best left to a jury. *See Quintero v. Caribe G.E. Power Breakers, Inc.,* 234 F.Supp.2d 108, 111–12 (D.P.R.2002).

■ The record before the court consists primarily of Figueroa's undisputed, unrebutted deposition testimony. With the exception of the August 2003 incident, Lilly does not contest Figueroa's allegations regarding Rodríguez and Vellón's conduct. Thus, the court's analysis focuses on whether the conduct about which Figueroa testified was sufficiently severe or pervasive that it created an abusive working environment. While it is unlikely that any of the incidents Figueroa alleges alone rises to the level of actionable harassment, considering the totality of the circumstances, the evidence in this case would permit—although certainly not compel—a reasonable jury to find that the plaintiff was subjected to a hostile work environment. Viewing the evidence in the light most favorable to Figueroa and resolving all factual disputes in her favor, the record discloses numerous, sexually charged incidents, some humiliating and one involving unwanted and explicitly sexual physical contact with an intimate body part. Figueroa presented evidence that

Rodríguez and Vellón frequently made sexual comments to her during exercise sessions. Moreover, Figueroa testified that Rodríguez and Vellón made sexually suggestive comments directly to her two or three times per week.[5] *See* Figueroa Depo. p. 189. This evidence, although thin, is sufficient to allow Figueroa to take this case to a jury. The determination regarding whether Rodríguez and Vellón's alleged conduct was sufficiently severe or pervasive requires a fact intensive analysis and will involve assessing the weight of evidence and credibility of witnesses. Consequently, it is better resolved by a jury at trial, not by the court at summary judgment.

**2. Subjectively Offensive**

■ In order to prevail on a hostile work environment claim, a plaintiff must also show that she subjectively perceived the unwelcome conduct as offensive. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Lilly argues that Figueroa offers no evidence to suggest that she found Rodríguez and Vellón's comments offensive. Contrary to Lilly's assertion, however, the record contains evidence that she complained of sexual harassment to various individuals on multiple occasions. Although it is unclear when Figueroa made many of her complaints or what exactly she said, the fact that she complained supports the conclusion that Rodríguez and Vellón's conduct was unwelcome and subjectively offensive. Figueroa also testified

---

**5.** Lilly urges the court to ignore Figueroa's testimony that Rodríguez and Vellón's comments occurred on a weekly basis because it is inconsistent with her deposition testimony which situated the specific sexual harassment incidents within several months of each other. Although Figueroa's testimony that the comments occurred weekly may not carry any weight with the jury, the court may not disregard the testimony at the summary judgment stage. To do so would require the court to assess Figueroa's credibility, a task which is outside the court's province. *See Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 53, 55 (1st Cir.2000) (noting court does not make credibility determinations at summary judgment stage).

that she cried in front of her supervisor after one incident and often responded by telling the alleged harassers to "go to hell." Furthermore, she testified that she would sometimes joke with Rodríguez and Vellón in hopes that they would desist. *See* Figueroa Depo. p. 142. Figueroa has, therefore, presented sufficient testimony to raise a triable issue regarding whether she subjectively perceived Rodríguez and Vellón's conduct to be offensive.

### 3. Employer Liability

▮▮▮ The applicable standard for assessing employer liability depends upon whether the offending employees are supervisors or merely co-workers. To establish employer liability for the conduct of a co-worker, a plaintiff must demonstrate that the defendant knew or should have known of the alleged harassing conduct and failed to respond with prompt and appropriate action. *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 401 (1st Cir.2002); *Quintero*, 234 F.Supp.2d at 112. When a plaintiff bases a hostile work environment claim on the actions of co-workers, she retains the burden of proof to show employer's knowledge and the inadequacy of its response. The employer in a co-worker harassment case cannot assert the *Faragher/Ellerth* defense to avoid liability and must prevail under the traditional negligence standard to escape liability.[6] *Ortiz v. Hyatt Regency Cerromar Beach Hotel, Inc.*, 422 F.Supp.2d 336, 342 (D.P.R.2006).

▮▮▮ An employer's knowledge can be based on actual or constructive notice of the alleged harassment. A plaintiff may prove actual knowledge with evidence of reports of harassment to management-level employees or someone who has the power to take action to remedy the problem. *See Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir.2001); *Sharp v. City of Houston*, 164 F.3d 923, 929–30 (5th Cir.1999). In the First Circuit, knowledge may be imputed to an employer if information regarding the harassment reaches an individual who is designated to received such complaints or "who is reasonably believed to have a duty to pass on the information." *Ortiz*, 422 F.Supp.2d at 342 (quoting *Crowley*, 303 F.3d at 403).

▮▮ In this case, the parties do not dispute that Rodríguez and Vellón were Figueroa's co-workers. Therefore, the court applies the negligence standard. Figueroa can only establish Lilly's liability for Rodríguez and Vellón's conduct by showing that the company knew or should have known of the harassment and failed to take appropriate steps to stop it. *See Crowley*, 303 F.3d at 401; *Ortiz*, 422 F.Supp.2d at 342. While much of Figueroa's evidence lacks detail, she has presented sufficient evidence to raise a trial issue regarding Lilly's knowledge and the adequacy of its response to her complaint. Figueroa testified that she repeatedly complained to Lilly officials that, specifically, she felt sexually harassed by Vellón and Rodríguez prior to the August 2003 incident. Her uncontested deposition testimony establishes that she informed the following supervisory and management-level individuals that she felt sexually harassed by Rodríguez and/or Vellón prior to the August 2003 incident: Edna Ortiz, her supervisor; Efraím Ortiz, Human Resource Manager; Nieves, Human Re-

---

**6.** When a plaintiff alleges that a supervisor created a hostile work environment, the employer is vicariously liable unless the employer can satisfy the elements of an affirmative defense. Under the *Faragher/Ellerth* defense, an employer can avoid liability for supervisory harassment if the employer can show that it exercised reasonable care to prevent and correct the harassment and that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid the harm otherwise. *See Noviello*, 398 F.3d at 94–95.

sources Representative; and Colón, Department Head. In light of their positions and the terms of Lilly's sexual harassment policy, each of these individuals arguably had the power to take action to remedy the problem and a duty to pass on information regarding sexual harassment complaints.

There is no evidence in the record that any of the individuals to whom Figueroa complained did anything in response to the pre-August 2003 complaints. In fact, the reactions of Edna Ortiz and Efraín Ortiz indicate that they did not take Figueroa's concerns about Rodríguez and Vellón's conduct seriously. Moreover, Figueroa testified that she described all of Rodríguez and Vellon's sexually suggestive conduct to Nilda Nieves in August 2003. The record contains no evidence that Lilly ever questioned Rodríguez or Vellón, or anyone else for the matter, about Figueroa's allegations or took any other responsive action. This testimony, although far from overwhelming, is sufficient to raise a genuine issue of material fact regarding employer liability.

The court acknowledges that Figueroa's evidence lacks some detail and that a jury may ultimately conclude that her testimony is insufficiently detailed to be believable. Mindful of its inability to weigh evidence or assess credibility at summary judgment, however, the court concludes that Figueroa has presented sufficient testimony regarding Lilly's knowledge and the inadequacy of its response to overcome the summary judgment hurdle. *See Harvill v. Westward Commc'n, LLC*, 433 F.3d 428, 436 (5th Cir.2005); *Dominguez–Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1035–36 (9th Cir.2005).

Figueroa's hostile work environment evidence is far from overwhelming. She just barely clears the summary judgment hurdle. Moreover, before a jury, she will likely face significant weight of the evidence and credibility issues. She has, however, presented sufficient evidence to raise a triable issue regarding whether she endured an actionable hostile work environment. For the aforementioned reasons, Lilly's motion for summary judgment on Figueroa's hostile work environment claim is **DENIED.**

**B. Retaliatory Discharge**

 In addition to her hostile work environment claim, Figueroa alleges that Lilly violated Title VII when the company terminated her employment because she complained of sexual harassment by Rodríguez and Vellón. Title VII makes it unlawful for an employer to retaliate against a person who complains about discriminatory employment practices. *See* 42 U.S.C. § 2000e–3(a); *Noviello*, 398 F.3d at 88. To establish a *prima facie* case of retaliatory discharge, the plaintiff must show that: (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) a casual connection existed between the protected conduct and the adverse action. *Noviello*, 398 F.3d at 88. Once the plaintiff satisfies her *prima facie* burden, the defendant must produce a legitimate, nondiscriminatory reason for the adverse action. The ultimate burden then falls on the plaintiff to show that the employer's articulated reason was, in fact, pretext covering up retaliation. *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir.2003).

Lilly contends that Figueroa's *prima facie* case fails because she cannot demonstrate that she engaged in protected conduct or that a causal connection exists between her protected conduct and termination. Additionally, Lilly asserts that, even if Figueroa can satisfy her *prima facie* burden, summary judgment is warranted because the company articulated a legitimate, nondiscriminatory reason for Figueroa's termination and Figueroa offers no evidence to suggest that Lilly's reason was pretextual.

In her opposition to Lilly's summary judgment motion, Figueroa correctly points out that Lilly's reasons for terminating her employment are at the core of her retaliation claim. She argues that, because the parties dispute the reasons underlying her termination, the court must deny summary judgment. She fails to acknowledge, however, that a plaintiff may not avoid summary judgment simply by relying on unsupported allegations and speculation. *See Forestier Fradera,* 440 F.3d at 21; *Medina–Munoz,* 896 F.2d at 8. In this case, Figueroa must point to specific facts detailed in the record that support her theory regarding the reason behind her termination. *See Hoeppner v. Crotched Mountain Rehab. Ctr.,* 31 F.3d 9, 14 (1st Cir.1994); *Lipsett,* 864 F.2d at 895. Her claims will survive summary judgment only if she spells out, squarely and distinctly, her arguments and the facts upon which they rely. The court concludes that Figueroa has failed to do so. Therefore, summary judgment is warranted on her retaliation claim.

### 1. *Prima Facie* Case

Lilly does not contest the "adverse employment action" prong of Figuer-

oa's *prima facie* case.[7] The company does, however, argue that Figueroa has not shown that she engaged in protected conduct or that a causal connection exists between her protected conduct and termination. In evaluating Lilly's arguments, the court is mindful of the First Circuit's instruction regarding the plaintiff's initial burden to establish a *prima facie* case of retaliation. The First Circuit has repeatedly acknowledged that the plaintiff's *prima facie* burden is not onerous and is easily made. *See, e.g., Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 26 (1st Cir.2004); *Chungchi Che v. MBTA,* 342 F.3d 31, 38 (1st Cir.2003); *Kosereis v. Rhode Island,* 331 F.3d 207, 213 (1st Cir. 2003); *Fennell v. First Step Designs,* 83 F.3d 526, 536 (1st Cir.1996).

### a. Protected Conduct

Complaining to one's supervisors about perceived sexual harassment qualifies as protected conduct.[8] *Valentin–Almeyda v. Municipality of Aguadilla,* 447 F.3d 85, 95 (1st Cir.2006) (citing *Benoit,* 331 F.3d at 175). In order to enjoy Title VII's protection, however, an employee who complains about sexual harassment must have a good faith and objectively reasonable belief that the opposed prac-

---

7. Figueroa seeks damages for her allegedly retaliatory discharge. The court assumes that Figueroa points to her allegedly unjustified reprimands and negative evaluation as evidence to satisfy her ultimate burden of persuasion on her retaliatory discharge claim, not as independent bases on which to recover damages for retaliation. Her EEOC charge and federal court complaint allege only retaliatory termination. Moreover, the language in her opposition confirms that she only seeks damages for her termination. Finally, any claims for damages relating to the reprimands, probation, or evaluation would likely be untimely because all occurred more than 300 days before Figueroa filed her complaint. *See National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110–15, 122 S.Ct. 2061, 153

L.Ed.2d 106 (2002) (concluding continuing violation theory inapplicable to retaliation claims based on discrete acts).

8. Figueroa contends that Lilly terminated her employment because she complained of Rodríguez and Vellón's sexually charged conduct and because she informed Nieves of a rumor that Efraím Ortiz and Vellón were involved in a homosexual relationship. *See* Docket No. 19–3, ¶¶ 17–18. While reporting sexual harassment qualifies as protected conduct, transmitting a rumor about an individual's sexual preference and personal relationships certainly does not. Thus, Figueroa's contention that Lilly terminated her for informing Nieves of the rumor does not, in any way, support her Title VII retaliation claim.

tices violated Title VII. *Benoit,* 331 F.3d at 174–75; *Vélez v. Janssen Ortho LLC,* 389 F.Supp.2d 253, 261 (D.P.R.2005).

▋ Lilly contends that Figueroa's August 2003 complaint, which Figueroa contends triggered her termination, was made in bad faith inasmuch as it was not raised until the company confronted her with Vellón's allegations of sexual misconduct. Lilly also contends that Figueroa's belief that Rodríguez and Vellón's behavior violated Title VII was not objectively reasonable. The court disagrees with Lilly on both accounts. First, Lilly ignores Figueroa's testimony that she immediately reported the August 2003 incident to Luis Ortiz and soon thereafter recounted the event to Edna Ortiz and Efraím Ortiz, a Manager in the Human Resources Department. According to Figueroa's version of the events, this reporting occurred before Lilly confronted her with Vellón's allegations. Figueroa also offered testimony regarding prior complaints about Rodríguez and Vellón's conduct. Accepting her allegations as true, Figueroa demonstrated that she held a good faith belief that she was the victim of sexual harassment. Second, in light of the facts presented, a triable issue remains regarding whether Figueroa's belief that Rodríguez and Vellón's continued, sexually suggestive conduct constituted sexual harassment was objectively reasonable. This is especially true in light of the highly personal, sexual, and humiliating nature of the August 2003 incident. Consequently, the court concludes that Figueroa has presented sufficient evidence to raise a triable issue regarding whether she engaged in protected conduct when she complained of sexual harassment in August 2003.

### b. Causal Connection

▋ Title VII requires a plaintiff alleging retaliation to show a causal relationship between her protected conduct and the adverse employment action in order to satisfy her *prima facie* case. Close temporal proximity between two events may give rise to an inference of causal connection. *See Calero–Cerezo,* 355 F.3d at 25. Mere temporal proximity between an employer's knowledge of protected conduct and an adverse action may establish causation if the temporal proximity is "very close." *Id.* (quoting *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)); *see also Bishop v. Bell Atl. Corp.,* 299 F.3d 53, 60 (1st Cir.2002); *Bajana v. Potter,* 396 F.Supp.2d 78, 88 (D.P.R.2005). Courts have found three and four months intervals insufficient to establish causation. Conversely, the First Circuit concluded that a one month interval was sufficient to satisfy the causal connection prong of the *prima facie* case. *See Calero–Cerezo* at 25–26. In this case, Figueroa's termination came two weeks after she allegedly reported the August 2003 incident and Rodríguez and Vellón's other conduct to supervisors and Human Resources. In light of First Circuit precedent and the facts of this case, the court concludes that Figueroa has demonstrated a causal connection between her August 2003 complaint and her termination. She has, therefore, presented sufficient evidence to satisfy her minimal *prima facie* burden.

### 2. Legitimate, Nondiscriminatory Reason

▋ Once Figueroa satisfies her *prima facie* case, the burden shifts to Lilly to articulate a legitimate, nondiscriminatory reason for Figueroa's termination. Lilly has clearly and undeniably carried its burden of production. Lilly articulated its reasons for terminating Figueroa and submitted supporting evidence. Specifically, Lilly explained that, following a series of disciplinary reprimands in 2002, the company placed Figueroa on probation. The

company provided Figueroa with a probationary memo summarizing the reasons for the probationary period. Figueroa signed the probationary memo without protest. Before Figueroa's probation period ended, she was involved in an incident with Vellón in August 2003. The decision to terminate Figueroa's employment followed an investigation of that incident. After completing its investigation, Lilly concluded that Figueroa had violated the terms of her probationary period and the company's policies regarding sexual harassment. Moreover, Lilly believed that Figueroa had fabricated sexual harassment charges and lied during the investigation. *See* Docket No. 13, pp. 17–18. In light of its investigatory conclusions and Figueroa's probationary status, the company terminated her employment. Thus, Lilly articulated a clear, specific reason for Figueroa's termination and satisfied its burden of production.

### 3. Pretext for Retaliation

 The burden of persuasion now shifts to Figueroa who must demonstrate that the proferred explanation is a pretext for retaliation. Figueroa can no longer benefit from the presumption of retaliation that arises from her *prima facie* case. The court requires a more demanding showing at this step. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (noting court's inquiry proceeds to new level of specificity after defendant rebuts plaintiff's *prima facie* case). At the pretext stage, the court considers the ultimate question in a retaliation case: did the plaintiff present sufficient evidence that defendant's stated reason was a pretext for retaliation? *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir.1991). To avoid summary judgment, Figueroa must present sufficient evidence to create a genuine issue of fact with respect to two issues: whether the legitimate reasons Lilly

offered were not its true reasons and whether the real reason was retaliation. *See Calero–Cerezo*, 355 F.3d at 25–26; *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir.1994).

 Title VII does not prevent an employer from terminating an employee for any reason (fair or unfair) so long as the decision to discharge the employee does not stem from unlawful retaliatory animus. The court does not sit as a super personnel department, assessing the merits and rationality of the employer's legitimate, nondiscriminatory reasons. In evaluating pretext, the court must focus on whether the employer believed its stated reasons to be credible and reasonable, not whether the decision was wise or unwise. A plaintiff may only withstand *brevis* disposition if she offers sufficient evidence that retaliation motivated the employer's decision. *See Mesnick*, 950 F.2d at 824–25; *Gray v. N. Eng. Tel. & Tel. Co.*, 792 F.2d 251, 255–56 (1st Cir.1986).

 In this case, Figueroa has failed to point to specific facts that would demonstrate any sham or pretext intended to cover up Lilly's allegedly retaliatory motive. Her brief and under-developed retaliation argument fails to point to sufficient evidence to create a genuine issue of fact regarding the falsity of Lilly's reason and Lilly's retaliatory animus. Figueroa does not directly address her burden at the pretext stage of the *McDonnell Douglas* analysis. Rather, her memorandum of law focuses solely on her *prima facie* case. Because her arguments regarding the *prima facie* case also apply to the pretext and animus issues, the court considers them at this step in its analysis.

In support of her argument that retaliatory animus motivated her termination, Figueroa's opposition memorandum points to her unblemished performance record prior to January 2002. She conclusorily alleges

that all the reprimands and negative comments she received were unjustified. She points out that her reprimands came at some point after she first addressed concerns about Rodríguez' behavior to Edna Ortiz. She highlights that the negative comments in her January 2003 evaluation also arose at some point after she complained about Rodríguez and Vellón's conduct. She notes that she challenged the basis of her January 2002 written reprimand. She explains that the August 2002 verbal reprimand, which served as one of the bases for her probation, arose out of a meeting with Nieves during which Figueroa complained about Rodríguez' conduct and accused the company of ignoring her complaints. She points out that her January 2003 evaluation generally reflected that she performed acceptably since the beginning of her probationary period. Finally, she highlights the two week interval between her final complaint and her termination. This is the sum of the evidence on which Figueroa bases her argument that retaliation for complaining of sexual harassment motivated her termination. *See* Docket No. 19–3, pp. 15–18.

Figueroa's argument largely consists of conclusory allegations, opinion, and speculation. She fails to point the court to significantly probative evidence that the reprimands were, in fact, unjustified or that they were motivated by her sexual harassment complaints. Generalized allegations that the reprimands and negative comments occurred after she complained about Rodríguez and Vellón do not demonstrate that the reprimands and the complaints are causally connected. This is especially true given the fact that Figueroa provides detail regarding the timing and

substance of only two alleged complaints prior to her final complaint.[9] She also signed and accepted her probationary memo and the January 2003 evaluation which mentioned her various reprimands. She did so without protest and without mentioning her sexual harassment allegations. Additionally, although she may have performed acceptably between September 2002 and January 2003, she undeniably had more than seven months remaining on in her probationary period when Edna Ortiz completed the evaluation. Figueroa cannot contest the fact that she was on probation when the August 2003 incident occurred or the terms of her probation. The probationary memo explicitly states that any instance of unsatisfactory performance could lead to termination. Although Figueroa disputes the facts of the August 2003 incident, she cannot contest that fact that Lilly based its conclusion regarding the incident on meeting notes and written statements acquired during its investigation. While the notes and statements do not completely mirror Vellón's version, they are hardly worlds apart and certainly contradict Figueroa's version. Figueroa has not demonstrated that Lilly relied on the statements unreasonably or in bad faith or that retaliatory animus influenced Lilly's conclusions regarding the August 2003. Nor has Figueroa demonstrated that Lilly did not believe its stated reasons to be credible. Finally, while the short time period between her final complaint and her termination may suggest retaliatory motives, consideration of the larger scheme of events in this case dispels any such suggestion. *See Wright,* 352 F.3d at 478. Lilly placed Figueroa on probation nearly

---

**9.** Figueroa explained that, in August 2000, she informed Edna Ortiz of the incident during which Rodríguez said Figueroa was good enough to eat. In March 2001, she told Edna Ortiz that Rodríguez made movements with his tongue and noises with his mouth toward her. These reports came approximately eighteen months and ten months, respectively, before the first reprimand which was given to most of the warehouse employees.

eleven months before the August 2003 incident. Figueroa accepted the probation without protest. Between Figueroa's last complaint and her termination, the company conducted an investigation of the August 2003 incident and reasonably concluded that Figueroa had violated company policies and the terms of her probation. In light of the foregoing, the court concludes that Figueroa has failed to generate a triable issue regarding whether Lilly's stated reasons for her termination were pretext and whether its real reason was unlawful retaliatory animus.

In sum, Figueroa has not presented sufficient evidence from which a reasonable jury could infer that her employer retaliated against her for engaging in Title VII-protected activity. She has not pointed the court to specific facts that would enable a rational factfinder reasonably to infer that unlawful retaliation was a determinative factor in her termination. The court, therefore, **GRANTS** Lilly's motion for summary judgment on Figueroa's Title VII retaliation claim.

### C. Supplemental Claims

Based on the same factual allegations supporting her Title VII claims, Figueroa asserts several causes of action under the laws of the Commonwealth of Puerto Rico. Specifically, she alleges claims under the following laws: Law 17 of April 1988, P.R. Laws Ann. tit. 29, §§ 155–155m (sexual harassment); Law 69 of July 6, 1985, P.R. Laws Ann. tit. 29, §§ 1321–1341 (gender discrimination); Law 100 of June 30, 1959, P.R. Laws Ann. tit. 29, §§ 146–151 (gender discrimination); and Law 80 of May 30, 1976, P.R. Laws Ann. tit. 29, §§ 185a–185m (unjust dismissal).

### 1. Law 17, Law 69, and Law 100

■ Law 17, Law 69, and Law 100 serve virtually identical purposes and outlaw virtually identical behaviors. Each proscribes sexual harassment in the form

of a hostile work environment. *See Suarez Ruiz v. Figueroa Colon*, 145 P.R. Dec. 142, 148–49 (1998) (explaining Law 17 and Law 69 represent more specific prohibitions on conduct already proscribed by Law 100 and noting all three statutes form a single legislative scheme to further the public policy against gender discrimination); *Miro Martinez v. Blanco Velez Store, Inc.*, 393 F.Supp.2d 108, 114 (D.P.R.2005) (discussing relationship between Law 17, Law 69, and Law 100). Law 69 proscribes discrimination in the workplace on the basis of gender. *See* P.R. Laws Ann. tit. 29, § 1321. Law 100 also prohibits discrimination on the basis of gender. *See id.* at § 146. The Supreme Court of Puerto Rico has held that sexual harassment is a form of sex discrimination proscribed by Law 100. *See Delgado Zayas v. Hospital Interamericano*, 137 P.R. Dec. 643, 651 (1994). Moreover, this court has recognized that the prohibition on gender discrimination in Law 69 overlaps with Law 17's prohibition against sexual harassment in the workplace. *See Miro Martinez*, 393 F.Supp.2d at 114.

■ Law 17, the most recent and specific of the laws addressing sexual harassment, largely tracks the language of the EEOC guidelines regarding hostile work environment claims. This court has recognized that Law 17 conforms to the hostile work environment requirements established in Title VII. *See Garcia v. Suarez & Co.*, 288 F.Supp.2d 148, 161 (D.P.R.2003). Figueroa's Title VII hostile work environment claim survives Lilly's motion for summary judgment. Consequently, the court concludes that her hostile work environment-based claim under Laws 17, 69, and 100 also withstands *brevis* disposition. The court, therefore, **DENIES** Lilly's motion for summary judgment on Figueroa's hostile work environment claim under Puerto Rico law.

Conversely, Figueroa's state law retaliation claim does not withstand summary judgment. Law 17 protects an employee against retaliatory action by an employer due to an employee's participation in the lodging or investigation of a sexual harassment complaint. *See* P.R. Laws Ann. tit. 29, § 155h; *Campos–Orrego v. Rivera,* 175 F.3d 89, 95 (1st Cir.1999); *Matos Ortiz v. Puerto Rico,* 103 F.Supp.2d 59, 63 (D.P.R. 2000) (noting Law 17 supports sexual harassment and retaliation claims). Law 69 makes it unlawful for an employer "to dismiss or discriminate against any employee or participant who files a complaint or charge, or is opposed to discriminatory practices, or participates in an investigation or suit for discriminatory practices against the employer." P.R. Laws Ann. tit. 29, § 1341; *Rivera v. Johnson & Johnson,* 436 F.Supp.2d 316, 326 (D.P.R.2006) (dismissing Law 69 retaliation claim). In this case, the court concluded that Figueroa failed to present sufficient evidence to raise a triable issue regarding whether Lilly terminated her employment in retaliation for complaining of sexual harassment. Thus, to the extent that Figueroa's state law claims rely upon a retaliation theory, the court **GRANTS** Lilly's motion for summary judgment.

### 2. Law 80

According to Law 80, a dismissal without just cause is "[one] made by mere whim or fancy of the employer or without cause relative to the normal operation of the establishment." P.R. Laws Ann. tit. 29, § 185b. The statute allows termination for a number of reasons related to the employee's job performance including an employee's improper and disorderly conduct, negligent attitudes toward her work, and violations of the employer's policies. *See id.; Alvarez–Fonseca v. Pepsi Cola of P.R. Bottling Co.,* 152 F.3d 17, 28 (1st Cir.1998). The employer bears the ultimate burden to prove that it had just cause to terminate the employee *See* P.R. Laws Ann. tit. 29, § 185k; *Alvarez–Fonseca,* 152 F.3d at 28.

In this case, Lilly explained that its decision to terminate Figueroa came on the heels of its investigation of the August 2003 incident. Based on its investigation, the company concluded that Figueroa had violated the terms of her probation and company policy, fabricated sexual harassment charges, and lied during the investigation. Lilly demonstrated that Figueroa's termination was the final step in a series of progressive disciplinary measures. Figueroa failed to raise a genuine issue of fact regarding Lilly's reason for terminating her employment. Lilly has therefore demonstrated just cause. Consequently, Lilly's motion for summary judgment on Figueroa's Law 80 claim is **GRANTED.**

### IV. Conclusion

For the foregoing reasons, the court **DENIES IN PART** and **GRANTS IN PART** Lilly's motion for summary judgment (Docket No. 12). The court hereby **DENIES** Lilly's motion for summary judgment with respect to hostile work environment claims under federal and Puerto Rico law. The court **GRANTS** summary judgment on the issue of retaliation under federal and Puerto Rico law and the unjust dismissal claim under Law 80.

**SO ORDERED.**